1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

MICHAEL HAYES,

                  Plaintiff,

v.

CAROLYN W. COLVIN, Acting

Commissioner of Social Security,

                 Defendant.

Case No.: 3:16-cv-00140-JLS-MDD

**REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

[ECF NOS. 11,12]

     Plaintiff Michael Hayes ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability and disability insurance benefits under Title II for supplement security income payments under

1

Title XVI of the Social Security Act.  Plaintiff moves the Court for summary judgment reversing the Commissioner and ordering an award of benefits, or, in the alternative, to remand the case for further administrative proceedings.  (ECF No. 11).  Defendant moved for summary judgment affirming the denial of benefits.  (ECF No. 12).

For the reasons expressed herein, the Court recommends the case be remanded for further review of Plaintiff's allegations of right knee impairment.  Regarding the remaining claims presented, it is recommended that Plaintiff's motion for summary judgment be denied and Defendant's motion be granted.

# I.  BACKGROUND

Plaintiff alleges that he became disabled on March 1, 2012, due to a right knee impairment and several mental impairments (i.e., depression and bipolar disorder with symptoms of anger, racing thoughts, manic episodes and an inability to focus or concentrate). (A.R. 17-18).[1]  Plaintiff's date of birth, November 8, 1972, categorizes him as a younger person on the alleged disability onset date.  20 C.F.R. §§ 404.1563, 416.963.  (A.R. 19).

## A.  Procedural History

On October 24, 2012, Plaintiff filed an application for social security disability insurance benefits.  (A.R. 141-147).  This claim was initially denied on January 8, 2013, and denied upon reconsideration on April 4, 2013.  (A.R. 12).  On February 28, 2014, Plaintiff appeared via

---

[1] "A.R." refers to the Administrative Record filed on May 15, 2016, and is located at ECF No. 9.

2

1   video teleconference from San Diego, California before Administrative

2   Law Judge ("ALJ") Paul Coulter in San Bernardino, California.  (*Id.*).

3   Plaintiff and Gregory S. Jones, an impartial Vocational Expert ("VE"),

4   testified.  (*Id.*).

5       On April 11, 2014, the ALJ issued a written decision finding

6   Plaintiff not disabled.  (A.R. 12).  Plaintiff appealed, and the Appeals

7   Council declined to review the ALJ's decision.  (A.R. 1).  Consequently,

8   the ALJ's decision became the final decision of the Commissioner.  (*Id.*).

9       On January 21, 2016, Plaintiff filed a Complaint with this Court

10  seeking judicial review of the Commissioner's decision.  (ECF No. 1).

11  On April 15, 2016, Defendant answered and lodged the administrative

12  record with the Court.  (ECF Nos. 8, 9).  On July 22, 2016, Plaintiff

13  moved for summary judgment.  (ECF No. 11).  On August 15, 2016, the

14  Commissioner cross-moved for summary judgment and responded in

15  opposition to Plaintiff's motion.  (ECF Nos. 12, 13).  Lastly, on August

16  29, 2016, Plaintiff replied to the Commissioner's response.  (ECF No.

17  14).

18              **II.  <u>DISCUSSION</u>**

19       **A.  <u>Legal Standard</u>**

20       The supplemental security income program provides benefits to

21  disabled persons without substantial resources and little income.  42

22  U.S.C. § 1383.  To qualify, a claimant must establish an inability to

23  engage in "substantial gainful activity" because of a "medically

24  determinable physical or mental impairment" that "has lasted or can be

25  expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 1382c(a)(3)(A).  The disabling impairment must be so severe that, considering age, education, and work experience, the claimant cannot engage in any kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner makes this assessment through a process of up to five steps.  First, the claimant must not be engaged in substantial, gainful activity.  20 C.F.R. § 416.920(b).  Second, the claimant must have a "severe" impairment.  20 C.F.R. § 416.920(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work.  20 C.F.R. § 416.920(d).  If the claimant's impairment meets or is equivalent to the requirements for one of the listed impairments, benefits are awarded.  If the claimant's impairment does not meet or is not equivalent to the requirements of a listed impairment, the analysis continues to a fourth and possibly fifth step and considers the claimant's residual functional capacity.  At the fourth step, the claimant's relevant work history is considered along with the claimant's residual functional capacity.  If the claimant can perform the claimant's past relevant work, benefits are denied.  20 C.F.R. § 416.920(e).  At the fifth step, if the claimant is found unable to perform the claimant's past relevant work, the issue is whether the claimant can perform any other work that exists in the national economy, considering the claimant's age, education, work experience, and residual functional capacity.  If the claimant cannot do other work that exists in the national economy, benefits are awarded.  20 C.F.R. § 416.920(f).

Section 1383(c)(3) of the Social Security Act, through Section 405(g) of the Act, allows unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C. §§ 1383(c)(3), 405(g).  The scope of judicial review is limited and the Commissioner's denial of benefits "will be disturbed only if it is not supported by substantial evidence or is based on legal error."  *Brawner v. Secretary of Health & Human Services*, 839 F.2d 432, 433 (9th Cir. 1988) (quoting *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)).

Substantial evidence means "more than a mere scintilla" but less than a preponderance.  *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).  "[I]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quoting *Andrews v. Shalala* 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusions.  *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  When the evidence is inconclusive, "questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary."  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

The ALJ has a special duty in social security cases to fully and fairly develop the record in order to make an informed decision on a claimant's entitlement to disability benefits.  *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).  Because disability hearings are not

5

1    adversarial in nature, the ALJ must "inform himself about the facts

2    relevant to his decision," even if the claimant is represented by counsel.

3    *Id.* (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983)).

4        Even if a reviewing court finds that substantial evidence supports

5    the ALJ's conclusions, the court must set aside the decision if the ALJ

6    failed to apply the proper legal standards in weighing the evidence and

7    reaching his or her decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th

8    Cir. 1978).  Section 405(g) permits a court to enter a judgment

9    affirming, modifying or reversing the Commissioner's decision.  42 U.S.

10   C. § 405(g).  The reviewing court may also remand the matter to the

11   Social Security Administration for further proceedings.  *Id.*

12   **B.   The ALJ's Decision**

13       The ALJ concluded Plaintiff was not disabled, as defined in the

14   Social Security Act, from March 1, 2012, through the date of the ALJ's

15   decision, April 11, 2014.  (A.R. 12).

16       The ALJ found Plaintiff has the following severe impairments:

17   right knee osteoarthritis, obesity, bipolar disorder, anger disorder,

18   depressive disorder, intermittent explosive disorder, and polysubstance

19   abuse in remission (20 C.F.R. § 404.1520(c)).  (A.R. 14).  The ALJ

20   determined Plaintiff did not have an impairment or combination of

21   impairments that meets or was medically equivalent to the severity of

22   one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

23   Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (A.R. 15-

24   16).  The ALJ noted that "[n]o treating or examining physician has

25   recorded findings equivalent in severity to the criteria of any listed

3:16-cv-00140-JLS-MDD

impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment."  (A.R. 15).

The ALJ found that Plaintiff has the residual functional capacity ("RFC") to:

> [P]erform medium work . . . except [Plaintiff] can lift, carry, push or pull 50 pounds occasionally and 25 pounds frequently. [Plaintiff] can stand, walk and sit for about 6 hours out of an 8-hour workday. Postural activities such as climbing, balancing, stooping, kneeling, crouching, and crawling can be performed on an occasional basis; however, no work on ladders, ropes, or scaffolds. [Plaintiff] can understand, remember, and carry out simple job instructions, but would be unable to perform work that would require directing others, abstract thought, or planning. [Plaintiff] can have occasional interaction with coworkers and supervisors, but no direct interaction with the general public.

(*Id.*).  The ALJ supported his RFC finding by explaining:

> In sum, the evidence as a whole supports the [RFC] assessed by this decision. . . . [Plaintiff's] subjective complaints are only partially credible and the objective medical evidence does not support the alleged severity of his symptoms. The undersigned finds the [Plaintiff] has not been deprived of the ability to perform work subject to the residual functional capacity assessed by this decision for any 12-month period since the alleged onset date.

(A.R. 19).

The ALJ found that Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2015." (A.R. 14).  Furthermore, the ALJ noted, Plaintiff "has at least a high school education and can communicate in English (20 C.F.R. §

7

404.1564).” (A.R. 20).  According to the ALJ, transferability of job skills is a nonissue because Plaintiff “does not have past relevant work (20 C.F.R. § 404.1568).” (*Id*.).

 Gregory S. Jones, the VE, testified that Plaintiff can perform occupations such as hand packager, industrial cleaner, or cleaner. (*Id*.). Relying on the VE’s testimony, Plaintiff’s age, education, work experience, and RFC, the ALJ concluded that Plaintiff is capable of successful adjustment and performance in other jobs that exist in significant numbers in the national economy. (A.R. 20-21). This required a finding that he is not disabled. (*Id*.).

In determining that Plaintiff is not disabled, the ALJ specifically noted the following to be of particular relevance:

## 1. Nonexertional Impairments

### a) State Agency Mental Medical Consultants

The ALJ afforded significant, but not full, weight to the State agency mental medical consultants on initial review and on reconsideration. (A.R. 19).  Dr. Rose Moten, PhD., found mild restriction in activities of daily living and in maintaining concentration, persistence or pace. (A.R. 54). Dr. Moten found moderate difficulties in maintaining social functioning.  No repeated episodes of decompensation, each of extended duration were found. (*Id*.).  The report of Dr. Funkenstein, M.D., found Plaintiff does have a medically determinable impairment “that could reasonably produce the alleged symptoms.” (A.R. 67). “The severity of his limitations do not preclude [an] ability to engage in simple, unskilled work activity.” (*Id*.).  Dr.

Funkenstein added that Plaintiff "demonstrates cognitive strengths and has no difficulty in comprehending and carrying out simple directions." (A.R. 69). Neither did Dr. Funkenstein believe that Plaintiff's activities of daily living reflected "significant limitations due to mental functioning." (*Id.*)

Generally, all the State agency medical consultants opined that Plaintiff is able to understand, remember, and carry out simple job instructions.

### b)  John Jeter, MA, LLP, LMSW

The ALJ afforded significant, but not full, weight to the psychiatric consultative examination on December 28, 2012, administered by Mr. Jeter supervised by Hugh Bray, PhD. (A.R. 17, 229-233).  According to Mr. Jeter, Plaintiff alleged he had bipolar disorder and stayed in his room all day staring out the window.  (*Id.*). He also admitted to a long history of substance abuse (i.e., alcohol, cocaine, and methamphetamines).  (*Id.*).  At the examination, Plaintiff could recall four numbers forward and three numbers backward.  (A.R. 15).  In addition, he spelled the word "world" backwards and subtracted 3's from 100 in two minutes (but only accurately to 76).  (*Id.*).  The examiner diagnosed Plaintiff with bipolar disorder, depression, and polysubstance abuse in remission with moderate difficulties in his ability to get along appropriately with the public and supervisors.  (A.R. 17, 233).  Further, despite the fact that Plaintiff was not on medication, Mr. Jeter found no difficulty in [Plaintiff's] ability to comprehend and carry out simple directions, and perform routine simple tasks. (233).

9

1

2

### c)  Other Records Related to Plaintiff's Nonexertional Impairments

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

In March 2013, Plaintiff began taking medication for his psychiatric condition.  (A.R. 18).  In May 2013, he began psychiatric treatment.  (*Id.*).  At his first treatment, Plaintiff said he stopped consuming alcohol four months prior and street drugs four to five years prior.  (*Id.*).  Plaintiff's primary care provider diagnosed him with bipolar disorder, intermittent explosive disorder, and unspecified drug dependence.  (*Id.*).   Plaintiff sought mental health treatment three more times.  (*Id.*).  In June 2013, Plaintiff reported anger issues, so he received a Lithium prescription to replace Celexa.  (A.R. 300).  In November 2013, Plaintiff reported he was anxious and still angry, so he received a Depakote prescription to replace the Lithium.  (A.R. 290). Lastly, in January 2014, he received a Seroquel prescription because he experienced racing thoughts, poor sleep and anxiety.  (A.R. 18, 290). Plaintiff "admitted that Depakote helped control his anger issues." (A.R. 17).  He testified at the Administrative Hearing that he suffered from depression, high manic episodes, and continued to have three to four bad days per week.  (*Id.*).

20

21

22

23

24

In his self report, Plaintiff reported he neither visits with friends or family nor socializes, but he lived with his sister in 2012 and currently resides with a friend.  (A.R. 15).  Based on the record presented, the ALJ found Plaintiff's ability to communicate and get along with others was moderately limited.  (*Id.*).

25

### 2.   Exertional Impairment

#### a)   State Agency Medical Consultants

The ALJ considered but "gave little weight to the opinions of the State agency medical consultants who opined that the claimant had no severe physical impairment and thus no corresponding limitations." (A.R. 19). The ALJ asserted that the consultants had inadequately considered Plaintiff's subjective complaints. In contrast to the State Agency medical consultants, the ALJ stated that he viewed the record evidence in a light most favorable to the Plaintiff and gave "generous consideration" to Plaintiff's subjective complaints, including a finding that Plaintiff's right knee osteoarthritis was a severe impairment. (*Id.*).

#### b)   Other Records Related to Plaintiff's Exertional Impairment

In March 2013, Plaintiff saw his primary care physician due to right knee pain. (A.R. 17, 287-289). By June 2013, Motrin did not relieve the pain, so x-rays were ordered. (*Id.*). In December 2013, an MRI revealed a complex tear of the medial meniscus as well as osteoarthritis. (*Id.*). In February 2014, after an examination at the San Diego Sports Medicine and Orthopedic Center, Plaintiff was diagnosed with right knee osteoarthritis. (*Id.*). Lora Rancourt, PA-C, reported decreased strength (i.e., movement against resistance, but less than normal) and tenderness to light touch. (*Id.*). Plaintiff seemed stable laterally to medially. (*Id.*). Ms. Rancourt documented that Plaintiff ambulated with an antalgic gait favoring his right side. (*Id.*). She referred Plaintiff to Dr. Myer (an orthopedic surgeon) explaining that

Plaintiff might benefit from removing the existing surgical hardware in his knee from a surgery performed when Plaintiff was a teenager. (*Id.*).

Plaintiff claimed his right knee bothers him when he sits or stands. (A.R. 17). Citing to Plaintiff's testimony, the ALJ noted that Plaintiff "opined that he could sit for about an hour at a time and could only walk for about 5 minutes." Plaintiff also noted he began taking Tramadol, Gabapentin, and Naproxen for his right knee pain. (*Id.*). Plaintiff reported no problems grooming himself or preparing simple meals. (A.R. 15). He said that he could schedule his own medical appointments and do his own laundry. (*Id.*). He stated that he neither performed any household chores nor shopped for himself. (*Id.*). Based upon the record presented, the ALJ found that Plaintiff can initiate and participate in his own activities of daily living with only mild restrictions. (A.R. 15). The ALJ noted that "there were no further records to review." (*Id.*).

### c)  Third Party Function Report

The ALJ concluded that the Plaintiff's "[s]ister, who based her observations and opinions on the [Plaintiff's] subjective complaints and behavior, through no fault of her own, is found to be only partially credible." (A.R. 19). In general, Plaintiff's sister reported that all Plaintiff does "is stay in his room and sleep." (A.R.184-191). The ALJ reasoned that statements by Plaintiff's sister primarily relied on Plaintiff's exaggerated subjective complaints; therefore, her statements were only partially credible.

### d)  Plaintiff's Testimony

12

The ALJ found Plaintiff's testimony concerning the intensity, persistence, and limiting effects of his alleged symptoms less than fully credible. (A.R. 17-19). Specifically, the ALJ reasoned, among other things, that "in view of the relatively benign medical evidence . . . [i]t appears the limited range of daily activities is a lifestyle choice and not due to any established impairment." (A.R. 18).

The ALJ found the medical record, or lack thereof, particularly important. Because Plaintiff described a long history of bipolar disorder but did not seek psychiatric treatment until March 2013, the ALJ determined that the alleged severity and corresponding limited treatment diminished Plaintiff's credibility. (A.R. 18). Similarly, the ALJ recognized Plaintiff's "relatively sparse" medical record and found that despite Plaintiff's alleged severe and disabling physical pain, he did not seek a "greater level of intervention and/or more aggressive treatment options" as one would expect by an individual with such severe and disabling impairments. (*Id.*). Accordingly, the ALJ concluded that Plaintiff "may have exaggerated his symptoms and their true limitations," especially because the limited medical records available indicated mild and conservative treatment. (*Id.*).

**C. Issues on Appeal**

**1.  The ALJ's Residual Functional Capacity Assessment**

The parties dispute whether the ALJ's residual functional capacity assessment is supported by substantial evidence.

Plaintiff argues that the ALJ's residual functional capacity was based upon his own interpretation of the medical evidence in regard to

13

Plaintiff's alleged disability of his right knee. Specifically, Plaintiff notes that three weeks before the hearing Plaintiff "was evaluated by a treating orthopedic consultation (sic) where a right knee MRI was assessed." (ECF 11-1 at 5).   According to Plaintiff, the ALJ erred because there was no opinion evidence from any treating source about his functional limitations nor did Plaintiff receive a consultative examination.  (*Id.*).   Plaintiff argues that it is beyond the scope of an ALJ's authority to establish a residual functional capacity without opinion evidence from a medical treatment provider. (*Id.*)   Plaintiff points out that the record is devoid of any opinion by a medical treating or examining provider concerning Plaintiff's knee.  Moreover, despite Plaintiff's request for a consultative medical exam during his administrative hearing, the ALJ did not authorize one.  Plaintiff argues "if there are conflicting medical opinions of a claimant's RFC, the ALJ may choose which opinion to credit and which to reject, and the regulations recognize this right" but error occurs when an ALJ makes an RFC determination without medical evidence on the issue. (*Id.*).   Plaintiff contends, however, that since the ALJ had no medical opinion evidence and failed to augment the record by ordering a consultative examination, the ALJ's RFC assessment is not supported by substantial evidence.  (*Id.*).

Defendant asserts Plaintiff's argument is unpersuasive because "the ALJ rationally found that Plaintiff had no impairment or combination of impairments, which would preclude his ability to perform other work existing in . . .  the national economy." (ECF 12-1 at 4).  Defendant also argues that "it was not incumbent upon the ALJ to order a consultative examination to develop the record further in order to assist in his analysis of his RFC." (*Id.*).  Defendant cites to the

14

language § 404.1519(a) which provides that consultative examinations are discretionary and there was no obligation for the ALJ to order a consultative physical evaluation because "an ALJ has a duty to develop the record [] only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." (ECF 12-1 at 5 citing *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (internal citations omitted), and here neither circumstance existed.

The Court has conducted a thorough review of the record and finds that the ALJ erred by overlooking the lack of evidence in the record that accurately or completely described Plaintiff's physical functional limitations.

Title 20 C.F.R. § 404.1546(c) of the Code of Federal Regulations states in pertinent part, "at the administrative law judge hearing level …, the administrative law judge … is responsible for assessing your residual functional capacity." Additionally, the ALJ is required to interpret the medical records.  Title 20 C.F.R.  § 416.927(6)(d)(1) states in part, "[w]e use medial sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s).  Although we consider opinions from medical sources . . . the final responsibility for deciding these issues is reserved to the [ALJ]."  However, "the ALJ's RFC determination or finding must be supported by medical evidence, particularly the opinion of a treating or an examining physician." *Banks v. Barnhart*, 434 F.Supp.2d 800, 805 (C.D. Cal. 2006).

In this case, the ALJ found that the medical record showed Plaintiff had osteoarthritis of the right knee. (A.R. 289). In November 2013 La Maestra Community Health examined Plaintiff's knee based upon his complaints of pain and swelling. Upon examination by Dr.

Ebtissam Korkis, M.D., Plaintiff exhibited tenderness to palpitation accompanied by mildly reduced range of motion. (A.R. 251). Dr. Korkis noted a positive anterior and posterior drawer test, however, neither Plaintiff's right hip nor right ankle appeared to have reduced range of motion, swelling, erythymia or effusion. (*Id.*). Dr. Korkis also reported that Plaintiff's balance and gait was intact. (*Id.*) At that time Plaintiff was referred for an MRI. (A.R. 252). The MRI was taken on December 6, 2013 and interpreted by Dr. Chang, M.D. According to Dr. Chang, the MRI showed a complex tear of the medial meniscus; posterior horn lateral meniscus vertical tear; osteoarthritis; chronic anterior cruciate ligament tear and a popliteal cyst. (A.R. 267). The ALJ also cited to Plaintiff's appointment on February 7, 2014, at the San Diego Sports Medicine and Orthopedic Center. Plaintiff had x-rays of his right knee and was seen by Lora Rancourt, PA-C.[2] Ms. Rancourt reviewed both the December 2013 MRI and the more recent x-rays. Ms. Rancourt also performed a physical exam of the right knee. Specifically, Ms. Rancourt noted Plaintiff's range of motion was from 3 to 95 degrees, he exhibited pain on both extension and flexion. Plaintiff was found to have decreased strength 4+/5 in both directions but was stable varus to valgus. Ms. Rancourt noted the presence of a surgical screw in his proximal fibular head and also noted marked medial compartment joint space loss. Her final diagnosis was right knee osteoarthritis with post surgical pain. Ms. Rancourt's treatment plan included a referral to Dr. Myer to discuss the removal of the surgical hardware. (A.R.19).

---

[2] Ms. Rancourt's status as a Physician's Assistant gives her opinion less weight than any type of medical doctor or other licensed specialist. PAs are considered "other sources" under 20 C.F.R. 404.1513(d) and are not entitled to the same deference as "acceptable medical sources" like licensed physicians and certain other qualified specialists. See 20 C.F.R. § 404.1513(a).

3:16-cv-00140-JLS-MDD

As stated previously, the ALJ incorporated the findings from these medical records into his final RFC assessment. However, notably absent in these records is any evidence about how Plaintiff's right knee impairment affects Plaintiff's current ability to function. "An administrative law judge may not draw upon his own inferences from medical reports." *See Navland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) citing *Lundi v. Weinberger*, 520 F.2d 782,785 (8th Cir. 1975)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700,704 (8th Cir. 2001) (internal citations omitted).

In this case, the ALJ's RFC assessment regarding Plaintiff's knee impairment was not based on substantial evidence because the ALJ failed to develop the record about how Plaintiff's knee impairment affects his ability to function. *Mendoza v. Barnhart*, 436 F.Supp 2d 1110, 1116 (C.D. Cal 2006). Specifically, Dr. Korkis, M.D. is the only treating physician contained in the record. A review of Dr. Korkis' medical report shows a diagnosis as mentioned above. Primarily osteoarthritis with tenderness on palpitation and mildly reduced range of motion. (A.R. 251). Dr. Korkis stated "[g]iven history of previous trauma and surgery we need to reevaluate by MRI of the right knee. And referral to orthopedics." (A.R. 252). Dr. Korkis did not provide an opinion on Plaintiff's level of functional limitation.

Second, the results of the MRI requested by Dr. Korkis were contained in a report prepared by Grossmont Imaging. Dr. Chang, M.D. was the reading radiologist. Dr. Chang presented detailed findings, including "complex tearing of the entire medial meniscus. . . ; osteoarthritis with near complete denudation of the articular cartilage

17

3:16-cv-00140-JLS-MDD

in the medial femorotibial compartment. . . ; chronic anterior cruciate ligament tear. . . ; small joint effusion with leaking popliteal cyst. . . ." (A.R. 267).  Dr. Chang did not provide any opinion as to Plaintiff's functional ability.

Third, Ms. Lora Rancourt-PA-C examined Plaintiff's knee.  The record here shows that it was Ms. Rancourt who conducted Plaintiff's exam and reviewed the x-ray and the earlier MRI report prepared by Dr. Chang. (A.R. 288-289).  The record also shows that Ms. Rancourt made the diagnosis of right knee osteoarthritis and postsurgical pain in the report. (A.R. 289). She recommended surgery to remove the "surgical screw…present in his proximal fibular head." (*Id.*)  She also noted he complains of a lot of pain medially as well as laterally. (*Id.*). Ms. Rancourt did not offer any opinion of Plaintiff's functional limitations.  Nevertheless, the ALJ cited almost exclusively to Ms. Rancourt's report to support his RFC assessment regarding Plaintiff's alleged right knee impairment.

Without the benefit of any statements from these medical sources about what Plaintiff could still do despite his impairment, the ALJ determined that Plaintiff's residual functional capacity could include occasional climbing, kneeling, crouching and crawling. (A.R. 16).

Additionally, the ALJ's citation to the opinions of the State agency medical consultants did nothing to support his RFC findings. Specifically, the ALJ noted, "[i]n determining the [] residual functional capacity the undersigned ultimately gave little weight to the opinions of the State agency medical consultants" who found no severe physical impairment "and thus no corresponding limitations." (A.R. 19, citing to Exhibit 1A and 3A of the Administrative Record).  The reports to which the ALJ refers did not find any physical medically determinable

18

impairment because neither consultant had the reports from Dr. Korkis (November 2013); the MRI results accompanied by Dr. Chang's findings (December 2013); or the x-ray results accompanied by Ms. Rancourt's examination and findings (February 2014). All of these records postdated the State agency medical reports. Specifically, the State agency medical report marked as Exhibit 1A (A.R. 50) was prepared in January 2013 and the State agency medical report marked as Exhibit 3A (A.R. 61) was prepared in April 2013.

In the end, the ALJ's RFC regarding Plaintiff's alleged right knee disability is not supported by substantial evidence. "Substantial evidence is relevant evidence which a reasonable person might accept as adequate to support a conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). "When 'the administrative record does not contain any opinion by a treating or examining physician regarding plaintiff's RFC,' the ALJ has a duty to obtain 'such an opinion.'" *de Lopez v. Astrue*, 643 F.Supp. 2d 1178, 1183 (C.D. Cal. 2009) (internal citations omitted). No physician has opined and no medical evidence is present in the record that supports the ALJ's RFC finding of what Plaintiff can do physically. The only specific evidence in the record are the results of the MRI and subsequent x-ray which are consistent with each other in their findings and similarly provide no opinion as to Plaintiff's functional limitations or his ability to perform sustained work. Based upon the evidence presented, it appears the ALJ incorrectly determined the record was sufficiently complete to allow him to reach a conclusion on this issue. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).

It is within the Court's discretion to decide whether to reverse and remand for administrative proceedings or to reverse and award

3:16-cv-00140-JLS-MDD

benefits. *McAlister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). In this case, remand is recommended. There is insufficient evidence in the record to consider whether Plaintiff's knee impairment has any effect on the limitations in Plaintiff's RFC and the ALJ has the authority to obtain additional evidence to satisfy his duty to fully and fairly develop the record. *See Tonapetyan*, 242 F.3d at 1150 (9th Cir. 2001) ("The ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'"). Accordingly, the Court recommends the case be remanded for further review of Plaintiff's alleged right knee impairment consistent with this report and recommendation.

## 2. Credibility of Plaintiff's Testimony

The parties dispute whether the ALJ offered substantial evidence to support his determination that Plaintiff's testimony regarding his non-exertional impairments.[3]

Plaintiff argues the ALJ failed to articulate clear and convincing reasons for rejecting his testimony. (ECF No. 11-1 at 6). Regarding the alleged mental impairments, Plaintiff first contends there are "consistent abnormal mental status examinations." Second,

---

[3] Based upon the Court's recommendation of remand for further development of the record regarding Plaintiff's alleged right knee impairment, analysis of Plaintiff's credibility with respect to his claimed exertional impairment is moot.

1  "treatment with prescription anti-psychotic and antidepressant
2  medication is not conservative treatment." (*Id.*).

3       Conversely, Defendant argues there is substantial evidence
4  supporting the ALJ's adverse credibility finding. (ECF No. 12-1 at 6).
5  Defendant states that a conservative or limited course of treatment and
6  the lack of objective evidence are each valid considerations when
7  assessing credibility. (*Id.* at 6-7). Defendant contends that Plaintiff's
8  extreme allegations combined with his mild and conservative care may
9  indicate that Plaintiff exaggerated his true symptoms and limitations.
10  (*Id.*). Moreover, Defendant argues the objective evidence, or lack
11  thereof, does not corroborate Plaintiff's subjective complaints. (*Id.* at 7).

12       The ALJ must make two findings before finding a Plaintiff's
13  testimony not credible. *Treichler v. Commissioner of SSA*, 775 F.3d
14  1090, 1102 (9th Cir. 2014). First, the ALJ must determine "whether the
15  claimant has presented objective medical evidence of an underlying
16  impairment 'which could reasonably be expected to produce the pain or
17  other symptoms alleged.'" *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d
18  1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341,
19  344 (9th Cir. 1991)). Second, if the claimant has produced such
20  objective medical evidence, "and the ALJ has not determined that the
21  claimant is malingering, the ALJ must provide 'specific, clear and
22  convincing reasons for' rejecting the claimant's testimony regarding the
23  severity of the claimant's symptoms." *Id.* (quoting *Smolen v. Chater*, 80
24  F. 3d 1273, 1281 (9th Cir. 1996). The ALJ must specifically identify the
25  testimony found not credible and explain what evidence undermines

3:16-cv-00140-JLS-MDD

1   that testimony. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir.

2   2001). An ALJ is not "required to believe every allegation of disabling

3   pain" or other impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.

4   1989).

5       Here, the ALJ found that Plaintiff's medically determinable

6   impairments could reasonably be expected to cause the alleged

7   symptoms. (A.R. 17). However, the ALJ found Plaintiff's testimony

8   "concerning the intensity, persistence and limiting effect of these

9   symptoms are not entirely credible. . . ." (*Id.*). The ALJ cited to: a) the

10   objective medical evidence in the record; b) evidence regarding

11   Plaintiff's medical treatments; c) Plaintiff's daily activities; and d)

12   inconsistencies in Plaintiff's testimony.

13       **a)   Objective Medical Evidence**

14       Where the ALJ finds that medically determinable impairments

15   could reasonably be expected to cause the alleged symptoms, the ALJ

16   may not reject a claimant's statements regarding intensity or severity of

17   pain or its effect on the ability to work solely because it is not supported

18   by the objective medical evidence. 20 C.F.R. § 404.1529(c)(2). "The ALJ

19   must specifically identify what evidence undermines the claimant's

20   complaints." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007).

21       Here, the ALJ found that Plaintiff has several severe

22   impairments: 1) right knee osteoarthritis; 2) obesity; 3) bipolar disorder;

23   4) anger disorder; 5) depressive disorder; 6) intermittent explosive

24   disorder; and 7) polysubstance abuse in remission. (A.R. 14).

25

1    After reviewing the record medical evidence in regard to Plaintiff's

2  alleged mental impairments, the ALJ afforded significant, but not full,

3  weight to the psychiatric consultative examination on December 28,

4  2012.  (A.R. 17, 229-233).  At the examination, Plaintiff alleged he

5  stayed in his room all day staring out the window and reported a long

6  history of substance abuse including alcohol, cocaine and

7  methamphetamines.  (*Id.*).  Plaintiff could recall four numbers forward

8  and three numbers backward.  (A.R. 15).  In addition, he spelled the

9  word "world" backwards and subtracted 3's from 100 in two minutes

10 (but only accurately to 76).  (*Id.*).  The examiner reported Plaintiff spoke

11 clearly; his gait and posture was within normal limits; he groomed and

12 dressed appropriately; he did not have any hearing or vision difficulties;

13 and he did not use any assistive devices.  (A.R. 229).  The examiner

14 diagnosed Plaintiff with bipolar disorder, depression, polysubstance

15 abuse in remission, and assessed a GAF score of 56.[4]  (A.R. 17, 230).

16    The ALJ also afforded significant, but not full, weight to the

17 psychiatric consultative examiner's report.  At Plaintiff's psychiatric

18 consultative examination, the examiner, John Jeter, MA, opined that

19 Plaintiff would experience moderate difficulties when getting along

20 appropriately with the public and supervisors and when creating and

21 maintaining good working relationships.  (A.R. 17, 229-233).  The

22 examiner concluded "there is no difficulty in the patient's ability to

23

24    [4] GAF stands for Global Assessment Functioning.  On a scale of 0-100 with higher
scores indicating a greater level of functioning.  A GAF score of 51-60 indicates
25 moderate symptoms or difficulty functioning.  American Psychiatric Association,
*Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

3:16-cv-00140-JLS-MDD

comprehend complex tasks." (A.R. 233).  Furthermore, the examiner reported that Plaintiff "responds to instructions well.  He responds to positive criticism well. . . .  Overall, the [Plaintiff] is cooperative, motivated, and verbally responsive.  His eye contact is poor.  His thoughts are logical, organized, simple and concrete.  Content of communication is age appropriate." (A.R. 231).  According to the examiner, Plaintiff would have no difficulty comprehending and carrying out simple directions or performing repetitive, routine simple tasks.  (*Id.*).  Notably, Plaintiff participated in the examination before he took medications.  (A.R. 230).

The ALJ considered Plaintiff's psychiatric treatment as well.  For example, in March 2013, Plaintiff began taking Celexa, a psychiatric medicine.  (A.R. 18, 239).  In May 2013, Plaintiff began psychiatric treatment.  (A.R. 18).  At his assessment, Plaintiff was diagnosed with 1) bipolar disorder, 2) intermittent explosive disorder, and 3) unspecified drug dependence.  (*Id.*).  Plaintiff underwent psychiatric treatment three more times.  (*Id.*).  First, in June 2013, Plaintiff reported anger issue, so he received a Lithium prescription in lieu of Celexa.  (A.R. 300).  Second, in November 2013, Plaintiff reported he was anxious and still angry, so he received a Depakote prescription to replace Lithium.  (A.R. 290).  Third, in January 2014, he received a Seroquel prescription because he experienced racing thoughts, poor sleep and anxiety.  (A.R. 18, 290).  Plaintiff was assessed a GAF score of 55.  (A.R. 247).  He confirmed Depakote's effectiveness and reported he had not been angry.  (A.R. 18, 290).  At the appointment, Plaintiff gave

24

good eye contact, he was alert, well-groomed, denied suicidal or homicidal behavior, spoke clearly, exhibited a linear thought process, demonstrated appropriate judgment and thought, and displayed good motivation for treatment.  (A.R. 290).

After citing to substantial medical evidence in the record, the ALJ found the medical evidence "relatively benign" to support the level of limitations alleged by the Plaintiff.  (A.R. 18).  Consequently, the ALJ did not err in rejecting Plaintiff's allegations of disabling mental limitations.

### b)  Medical Treatment

Evidence that a claimant only received conservative treatment is a valid ground for questioning claimant's assertions regarding severity of pain or symptoms.  *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *accord Parra v. Astrue,* 481 F.3d 742, 750–51 (9th Cir.2007) (explaining that evidence of conservative treatment is sufficient to discount a claimant's testimony about severity of an impairment). Additionally, the Ninth Circuit has long held that when an impairment is amenable to treatment, it cannot serve as the basis of disability.  *See Warre v. Commissioner of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (citing *inter alia, Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983)).  In this case, Plaintiff alleged he suffers from both exertional and nonexertional severe disabilities.

For Plaintiff's nonexertional impartment, first, the ALJ noted that "[Plaintiff] reported a history of bipolar disorder for many years, but he failed to seek out psychiatric treatment until March of 2013. . . ."  (A.R.

18).  Second, the ALJ considered the effectiveness of medications used to treat Plaintiff's bipolar disorder and intermittent explosive disorder. (A.R. 17-18).  Plaintiff indicated he used to self-medicate with substances (e.g., alcohol, cocaine and methamphetamines).  (A.R. 17). The record shows Plaintiff was prescribed Depakote with effective results and no reported anger issues.  (A.R. 17, 18, 35, 245).  In sum, Plaintiff reported a long history of bipolar disorder without psychiatric treatment, but after he sought treatment, he controlled his anger within a year.  (A.R. 17,18, 35, 245).

As noted herein, the ALJ identified several contradictions between Plaintiff's claims of disability and the medical treatment evidence presented in the record.  *Sample*, 694 F. 2d at 642 ("In reaching his findings, the administrative law judge is entitled to draw inferences logically flowing from the evidence").  Given Plaintiff's allegations of severe and disabling impairments, the ALJ reasoned that Plaintiff did not seek "a greater level of intervention and/or more aggressive treatment options" as one would expect.  (A.R. 18).  Moreover, Plaintiff treated his mental impairments with medication.  (A.R. 17, 18, 35, 245). The ALJ's citations to the record evidence regarding Plaintiff's treatment represent clear and convincing reasons for finding Plaintiff less than entirely credible.

### c)  Daily Activities

The Social Security regulations explicitly instruct an ALJ to evaluate the claimant's daily activities when determining the claimant's credibility.  20 C.F.R. § 404.1529(c)(3)(I); Social Security Ruling 96-7p,

(SSA July 2, 1996).  It is well settled that "[d]isability does not mean that a claimant vegetate in a dark room excluded from all forms of human and social activity."  *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (citation omitted).  An ALJ may, however, discredit a claimant's statements when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.  *See Morgan v. Cmm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *Fair*, 885 F.2d at 603 (9th Cir. 1989).  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.  *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

   The ALJ considered Plaintiff's sister's third party adult functioning report dated November 28, 2012.  (A.R. 182-191).  An ALJ may consider third party statements as evidence regarding the severity of Plaintiff's impairment.  *See* 20 C.F.R. § 416.913.  "If the ALJ wishes to discount the testimony of the lay witnesses, he must give reasons that are germane to each witness."  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *Bruce v. Astrue*, 557 F3d 1113 (9th Cir. 2009).  Here, the ALJ considered the third party adult function report from Laurie Lynn Stanley (Plaintiff's Sister) and opined the "[s]ister, who based her observations and opinions on the [Plaintiff's] subjective complaints and behavior, through no fault of her own, is found to be only partially credible."  (A.R. 19).  Thus, the ALJ accorded less weight to Ms. Stanley's report than the weight given to the reports of the medical

27

1    experts and consultative examiner.  (*Id*.).

2        The ALJ found that "even if the claimant's daily activities are
3    truly as limited as alleged, it is difficult to attribute that degree of
4    limitation to the claimant's medical condition." (A.R. 18).  Despite
5    Plaintiff's claim that he stays in bed, stares at walls, and looks out the
6    window from the time he wakes up until he goes to bed.  (A.R. 196, 230).
7    Likewise, his sister reported that he stays in his rooms and sleeps all
8    day. (A.R. 182-191).  The ALJ noted Plaintiff can groom himself,
9    prepare simple meals, do laundry, and make his own medical
10   appointments.  (A.R. 15).  Plaintiff also reported good sleep, a good
11   appetite, and an ability to cash checks and pay bills.  (A.R. 230).  He
12   acknowledged he can cash checks and pay bills.  (*Id*.).  When he goes
13   outside, he can go outside alone.  (A.R. 198).   After considering the
14   relevant evidence in the record, the ALJ found insufficient support for
15   the level of limitations alleged by the Plaintiff.  The ALJ determined
16   "the limited range of daily activities is a lifestyle choice and not due to
17   any established impairment." (A.R. 18).  The ALJ's citations to the
18   record evidence regarding Plaintiff's daily activities represent clear and
19   convincing reasons for finding Plaintiff less than entirely credible.

20      **d)  Inconsistencies in Plaintiff's Testimony**

21        Inconsistency in the claimant's testimony is an acceptable reason
22   that an ALJ may consider when assigning little weight to a claimant's
23   testimony. *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007).  An ALJ is
24   permitted to use "ordinary techniques of credibility evaluation" such as
25   inconsistent prior statements. *Tonapetyan*, 242 F.3d at 1148 (9th Cir.

2001).  "Consistency is one strong indication of the credibility of an individual's statements . . . ."  Social Sec. Ruling, 96-7p, (SSA July 2, 1996).

In social functioning, the ALJ found inconsistencies between Plaintiff's testimony and the record.  (A.R. 15).  Plaintiff stated he neither socialized nor visited with friends or family.  (A.R. 15).  Similarly, he testified he does not get along with co-workers, supervisors, and he could not handle people walking close to him.  (A.R. 37).  However, he lived with his sister in 2012 and currently resides with a friend.  (*Id*.).  Despite Plaintiff's testimony, the psychiatric consultative examiner opined Plaintiff only has moderate difficulty in his "ability to get along appropriately with the public and with supervisors" as well as his "ability to create and maintain good working relationships."  (A.R. 233).  Notably, Plaintiff was not on any psychiatric medication at the examination in December 2012, but he began taking Depokote in November 2013.  (A.R. 18, 233, 290).  Revealingly, Plaintiff testified about Depokote's efficacy: "[I]t keeps me calm where I'm not angry at the world or anyone."  (A.R. 36).  The ALJ's citations to the record evidence regarding Plaintiff's social functioning and inconsistencies in the testimony represent clear and convincing reasons for finding Plaintiff less than entirely credible.

In assessing Plaintiff's alleged racing thoughts and inability to focus, the ALJ found inconsistencies between Plaintiff's testimony and the record.  (A.R. 15)  As mentioned, Plaintiff reported he experienced racing thoughts and inability to focus.  (A.R. 15, 32, 36).  Nonetheless,

at his psychiatric consultative examination, he spelled the word "world" backwards, recalled four numbers forward and 3 numbers backward, and he subtracted 3's from 100 in two minutes (only accurately to 76). (*Id.*).  The examiner reported that Plaintiff's thoughts were "logical, organized, simple and concrete."  (A.R. 231).  He concluded "there is no difficulty in the [Plaintiff's] ability to comprehend complex tasks."  (A.R. 233).  Furthermore, in January 2014, at Plaintiff's last psychiatric follow-up, Plaintiff gave good eye contact, was alert, denied suicidal or homicidal behavior, spoke clearly, exhibited a linear thought process, demonstrated appropriate judgment and thought, and displayed good motivation for treatment.  (A.R. 290).  Thus, the ALJ's citations to the record evidence regarding Plaintiff's ability to focus or concentrate and inconsistencies in the testimony represent clear and convincing reasons for finding Plaintiff less than entirely credible.

As noted herein, the ALJ has identified several contradictions between Plaintiff's claims of disability and the medical evidence presented in the record.  *Sample*, 694 F.2d at 642 ("in reaching his findings, the administrative law judge is entitled to draw inferences logically flowing from the evidence.").  The ALJ's citations to the record represent clear and convincing reasons for finding Plaintiff less than credible regarding his functional limitations and for rejecting Plaintiff's testimony.  First, the ALJ considered the objective medical findings.  *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (explaining that medical evidence is a factor that the ALJ can consider in his credibility analysis).  Second, the ALJ considered the effectiveness of

30

medications and treatment in discounting the severity of Plaintiff's alleged disability. Third, the ALJ considered Plaintiff's daily activities. Fourth, the ALJ found inconsistencies between Plaintiff's testimony and information in the record. *See Burch*, 400 F.3d at 680 ("In determining credibility, an ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony.").

The ALJ made specific findings based upon the administrative record justifying the decision to disbelieve Plaintiff's allegations of disability. The ALJ discussed the evidence and provided clear and convincing reasons upon which his adverse determination of Plaintiff's credibility was based. *Treichler v. Commissioner of Social Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014). "Credibility determinations are the province of the ALJ" and are entitled to deference if sufficiently supported by the record. *Fair*, 885 F.2d at 604 (citing *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988)). "Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an allegation. . . and those findings are supported by substantial evidence in the record, our role is not to second guess that decision." *Id.* Because a reviewing court must uphold an ALJ's decision if it is supported by substantial evidence, this Court recommends denying Plaintiff's second claim.

## III. <u>CONCLUSION</u>

As the Court finds that the ALJ did not adequately address Plaintiff's claim of right knee disability, the Court **RECOMMENDS**

3:16-cv-00140-JLS-MDD

that the case be **REMANDED** for further development of the record regarding Plaintiff's exertional claim.

    **IT IS FURTHER RECOMMENDED** that Plaintiff's Motion be DENIED and that Defendant's Motion be **GRANTED** as to Plaintiff's non-exertional claims presented herein.  This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

    **IT IS HEREBY ORDERED** that any written objection to this REPORT must be filed with the Court and served on all parties no later than **January 3, 2017**.  The document should be captioned "Objections to Report and Recommendations."

    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **January 10, 2017**.  The parties are advised that failure to file objections within the specific time may waive the right to raise those objections on appeal of the Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

    IT IS SO ORDERED.

Dated:   December 19, 2016

Hon. Mitchell D. Dembin
United States Magistrate Judge

32

3:16-cv-00140-JLS-MDD